1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3           WESTERN DIVISION-LOS ANGELES

4                 - - -

5      HONORABLE PERCY ANDERSON, JUDGE PRESIDING

6                 - - -

7 ANDREA RIDGELL, on behalf of    )
  herself and others similarly   )
8 situated,                )
                     )
9             Plaintiff,   )
                     )
10       vs.             )  No. LACV 18-4916-PA
                     )
11                     )
  FRONTIER AIRLINES, INC., a    )
12 Colorado corporation; AIRBUS   )
  S.A.S., a foreign corporation  )
13 doing business in the State of  )
  California; AIRBUS GROUP HQ INC., )
14 a corporation doing business in  )
  the State of California,     )
15                     )
            Defendants.  )
16 _____)

17

18        REPORTER'S TRANSCRIPT OF PROCEEDINGS

19           Los Angeles, California

20          Monday, October 1, 2018

21             10:33 a.m.

22

23        PHYLLIS A. PRESTON, CSR, FCRR
       Federal Official Court Reporter
       United States District Court
24         3470 Twelfth Street
      Riverside, California 92501
25         stenojag@aol.com

1    APPEARANCES:

2

3    For the Plaintiff:

                        BRADLEY GROMBACHER, LLP
4                       BY:  **Kiley Lynn Grombacher**
                        2815 Townsgate Road, Suite 130
5                       Westlake Village, California 91361

6

7

8

9    For the Defendants:

10                      CLYDE & CO US LLP
                        BY:  **KEVIN SUTHERLAND**
11                          **JEFFREY ELLIS**
                        633 West 5th Street, 26th Floor
12                      Los Angeles, California 90071

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              MONDAY, OCTOBER 1, 2018; LOS ANGELES, CALIFORNIA

 2                                -o0o-

 3              THE CLERK:  Calling Item No. 1, CV 18-4916, Andrea

 4    Ridgell v. Frontier Airlines.

 5              Counsel, please state your appearances.

 6              MS. GROMBACHER:  Good morning, Your Honor.  Kiley

 7    Grombacher for the plaintiff.  Would you like me to use the

 8    center or am I okay here?

 9              THE COURT:  As long as you're near a microphone.

10              MR. ELLIS:  Jeffrey Ellis on behalf of Frontier, Your

11    Honor.

12              MR. SUTHERLAND:  Kevin Sutherland on behalf of

13    Frontier, Your Honor.

14              THE COURT:  Good morning.  What's the status of the

15    service on Airbus?

16              MS. GROMBACHER:  We haven't received -- we went

17    through a third-party server hoping that that would expedite

18    the process.  It was received in Paris quite a ways back, I

19    believe in July, but it has not been effectuated yet.  We

20    reached out to them to get an update, but they don't have any

21    further update, in terms of anticipated time, for right now,

22    unfortunately.  We had hoped that since it was, you know,

23    France it would move much quicker than some of the other

24    countries, but it hasn't proven so thus far.

25              THE COURT:  And you filed a motion to continue the
```

10:33

10:34

10:34

10:34

10:34

1    23-3 deadline?

2           MS. GROMBACHER:  We did, Your Honor, yes.  The reason

3    being is there is discovery from that party that we would need

4    to do the certification motions.  Some of the issues are

5    specific to one defendant.  But many of the claims that we          10:35

6    allege are specific to both defendants and require information

7    about the plane, specs of the plane, things that may not be in

8    the possession of the defendants.

9           THE COURT:  Like what?

10          MS. GROMBACHER:  Well, generally --                          10:35

11          THE COURT:  When was the -- when was the aircraft

12   sold or leased to Frontier?

13          MS. GROMBACHER:  Well, that's information that I

14   don't have right now.  But what I'm thinking of is it's this --

15   it's the design of the aircraft that is a big component to this     10:35

16   litigation.  We say that it's -- there is a failure to warn

17   that the specific design of the aircraft is defective.  And so

18   the specs of the aircraft to show that their fleet, this plane

19   as well as the other planes that we're seeking to certify,

20   would all be consistent, we would need that information from        10:36

21   the other defendant.

22          THE COURT:  Well, before you alleged this as a class

23   action, had you done any research as to -- and as I understand

24   it, what you're -- the plaintiff is alleging personal injuries

25   and seeking compensatory and punitive damages; correct?            10:36

1          MS. GROMBACHER:  For the plaintiff individually, yes.

2          THE COURT:  Okay.  And have you done any research as

3    to how the Ninth Circuit views class actions in the context of

4    an aviation claim where a person is seeking personal injuries?

5          MS. GROMBACHER:  Right.  We're not seeking personal          10:36

6    injuries on behalf of the class.  We have a failure to warn,

7    strict liability.  That would be more economic damages on

8    behalf of the class for the ticket price as opposed to personal

9    injuries.

10          THE COURT:  Well, let me ask you this:  You also have          10:37

11    a subclass; correct?

12          MS. GROMBACHER:  Correct.

13          THE COURT:  And that consists of all the people who

14    were on that particular flight?  I believe it was Flight 1630?

15          MS. GROMBACHER:  Yes, sir.  But that has to do with          10:37

16    when they were deplaned what happened in the terminal.  So

17    that's not specifically going to be the injury either.  That

18    would be the false imprisonment claim.

19          THE COURT:  So the subclass is not going to --

20    subclass is not going to be asserting any claims for injuries?          10:37

21          MS. GROMBACHER:  Not for injuries.  It will be

22    economic for the ticket price and then also for the

23    imprisonment, false imprisonment claim.

24          THE COURT:  The false imprisonment?

25          MS. GROMBACHER:  Mm-hmm.          10:37

```
 1              THE COURT:  So the flight was at --

 2              MS. GROMBACHER:  It was a red-eye.

 3              THE COURT:  It was a red-eye?

 4              MS. GROMBACHER:  It was a red-eye from LA that was

 5    intended to arrive in Orlando, but it was deplaned in Arizona,      10:37

 6    in Phoenix.

 7              THE COURT:  And what time did it touch down in

 8    Phoenix?

 9              MS. GROMBACHER:  Well, the flight to Phoenix, I think

10    is about an hour and a half, so it was pretty short after the      10:38

11    plane, you know, took off, a fraction of the total anticipated

12    air time.

13              THE COURT:  So I guess there really is no reason to

14    delay the certification as to that subclass?

15              MS. GROMBACHER:  You're saying that we should -- but      10:38

16    then it's not entirely judicially efficient to do multiple --

17              THE COURT:  Well, don't worry about my efficiency.

18    I'll take care of that.  If I -- once you get Airbus served, we

19    need to do another certification for Airbus, that's fine.  But

20    you've got Frontier here.  You've got an allegation as to a        10:38

21    claim which you purport to be a class as to that subclass.  So

22    I don't see any reason to delay that.

23              MS. GROMBACHER:  Okay.  I still think we need some

24    additional time for discovery on that claim because some of the

25    things, as we had noted in the joint report, that we would like    10:39
```

1    to do is to get the plane manifest and some other information,

2    and that's complicated in a case like this.

3            THE COURT:  That doesn't have anything to do with

4    whether or not the class ought to be certified.

5            MS. GROMBACHER:  No, it -- well, they're percipient          10:39

6    witnesses as to this claim.  And that claim is important

7    because false imprisonment may require that we show that people

8    requested the right to leave in order to certify.

9            THE COURT:  Well, I understand that.

10            MS. GROMBACHER:  Okay.                                        10:39

11            THE COURT:  But I don't see why if you -- if a

12    class -- if class treatment is appropriate, I don't see what

13    that has to do with the class.

14            And let me ask you something:  So they were probably

15    there sometime at midnight or very early in the morning?            10:39

16            MS. GROMBACHER:  Yes.  It was very early in the

17    morning.  It was about, I think, a four or five-hour time

18    period, maybe less.

19            THE COURT:  Four or five-hour time period?

20            MS. GROMBACHER:  Correct.  That plane didn't go --          10:40

21    that plane didn't take off again.  They were -- they were

22    routed onto new planes, new flights.

23            THE COURT:  Excuse me.  But by the time they -- when

24    they touched down in Phoenix, it's midnight, sometime early in

25    the morning; correct?                                               10:40

1              MS. GROMBACHER:  Yes, probably correct.

2              THE COURT:  Okay.  And at the time was there a

3    declared emergency?

4              MS. GROMBACHER:  You know, I'm not sure how

5    Frontier -- how they did that internally.  I just know that

6    they did land the plane.

7              THE COURT:  Well, let me ask them.  Was there a

8    declared emergency?

9              MR. ELLIS:  I believe, Your Honor, there was.  I'm

10   not sure if they actually declared an emergency or just

11   requested permission to land.  It might have been that they

12   declared an emergency.

13             THE COURT:  In other words, you don't know?

14             MR. ELLIS:  The answer is "yes."  And there's another

15   component --

16             THE COURT:  The answer is "yes" what, to which

17   question?  You know or you don't know?

18             MR. ELLIS:  I'm not 100 percent sure, Your Honor.

19             THE COURT:  Then you don't know since we don't want

20   you to guess.

21             MR. ELLIS:  Yes.  Thank you.  I just wanted to

22   mention one other thing, though, insofar as we're dealing with

23   late night arrivals in an airport where the checkpoint may have

24   been closed.  To the extent I have -- we have to disclose

25   information regarding any security procedures at the airport if

10:40

10:40

10:41

10:41

10:41

1   the checkpoint is closed, TSA does require us, under the

2   sensitive security information regulation, to --

3          THE COURT:  Go ahead.  I'm sorry.

4          MR. ELLIS:  No, to just run any of that disclosure by

5   them before it's disclosed.  And Ms. Grombacher may have to get          10:41

6   a sensitive security information clearance which is not a big

7   deal.  But there is a protocol that they follow.

8          THE COURT:  Okay.  Let me ask you something:  What

9   time does the airport close in Phoenix?

10         MR. ELLIS:  I believe -- I'm not 100 percent sure,          10:42

11  Your Honor, so I'm not going to guess.  I've requested that

12  information from the airport and from the client though.

13         THE COURT:  Okay.  Were there other flights that were

14  available at the time that plane touched down?

15         MR. ELLIS:  I don't know that, Your Honor.          10:42

16         THE COURT:  Okay.  And how many passengers were on

17  that flight?

18         MR. ELLIS:  I want to say about -- I don't want to

19  guess, but I think it was about 140.

20         MS. GROMBACHER:  I think that's -- I think that's          10:42

21  correct, but I don't have a completely accurate estimate.

22         THE COURT:  And when they declared the emergency --

23         MR. ELLIS:  If there was.

24         THE COURT:  If there was.

25         MR. ELLIS:  Right.          10:42

1          THE COURT:  Well, I take it this flight was supposed

2  to -- originated in Los Angeles, was supposed to go to Orlando?

3          MR. ELLIS:  Yes.

4          THE COURT:  Nonstop?

5          MR. ELLIS:  Mm-hmm.                                    10:43

6          THE COURT:  Okay.  So there was a reason why they

7  touched down in Phoenix?

8          MR. ELLIS:  Yeah.  And it's likely, Your Honor, that

9  they did declare an emergency, yes.

10         THE COURT:  Okay.  What was the reason for making     10:43

11  that unscheduled stop in Phoenix?

12         MR. ELLIS:  Again, and I have spoken to the TSA about

13  these issues, there is a protocol if there is an odor in the

14  cabin.

15         THE COURT:  Okay.  Is that the reason?                10:43

16         MR. ELLIS:  Your Honor, again, without making the

17  disclosures of information that I have to go through the TSA

18  for, I think it's reasonable to assume that, yes, a crew member

19  detected an odor, and the flight landed as a safety matter.

20         THE COURT:  Okay.  And where was that odor first      10:43

21  detected?  In the cockpit?  Cabin?

22         MR. ELLIS:  I can't say that with any certainty.  I

23  don't have my notes on that, Your Honor.  I don't want to guess

24  on that.

25         THE COURT:  And what type of aircraft was it?         10:44

```
 1              MR. ELLIS:  It was an Airbus.  It was an A319, I
 2     think.
 3              MS. GROMBACHER:  Yeah.
 4              THE COURT:  Did they purchase that aircraft or was it
 5     leased?  Did they purchase it new?                              10:44
 6              MR. ELLIS:  I'm almost certain it was leased, as most
 7     other aircraft -- most of their aircraft are, Your Honor.
 8              THE COURT:  Okay.  Do you know how old the aircraft
 9     was, how many hours were on it?
10              MR. ELLIS:  I don't have that data.  I have requested  10:44
11     that data from Frontier.  I haven't gotten it yet.
12              THE COURT:  Have you requested that the maintenance
13     records be maintained?
14              MR. ELLIS:  Yes, of course, Your Honor.
15              THE COURT:  Of course.  Have there been any other      10:45
16     actions filed by the passengers that were on that particular
17     flight?
18              MR. ELLIS:  Not that I'm aware of, Your Honor.
19              MS. GROMBACHER:  I don't believe so either, Your
20     Honor.                                                          10:45
21              THE COURT:  Okay.  Any other arguments either side
22     wishes to make with regard to this postponement of the 23-3?
23              MS. GROMBACHER:  Well, I just -- I pretty much think
24     that everything is in the papers and was said here.  I know
25     that the Ninth Circuit has commented that 23-3 is difficult in  10:45
```

1   many cases, and I think this is -- is one of those types of

2   cases.  It's a little bit more complicated than some perhaps

3   wage and hour --

4           THE COURT:  As to the subclass?

5           MS. GROMBACHER:  Even as to the subclass because the      10:46

6   information that we requested, he noted does require some

7   security information.

8           THE COURT:  Doesn't have anything to do with --

9   doesn't have anything to do with certification as far -- it may

10  have something to do with liability.  But in terms of           10:46

11  certification, I think we pretty much know what we're dealing

12  with here.

13          MS. GROMBACHER:  Well, if they raise individual

14  issues about consent to the -- to the false imprisonment, I'll

15  have difficulty without any discovery addressing that issue.    10:46

16          THE COURT:  I'm sorry.  If they raise what?

17          MS. GROMBACHER:  Issues about consent to the false

18  imprisonment claim, the plaintiff will have difficulty

19  addressing that without any discovery.

20          THE COURT:  Well, if you do, then we'll make some        10:46

21  adjustments for that if that's the issue.

22          MS. GROMBACHER:  I mean, we know very little, in

23  terms of the exact specifics of what grounded the aircraft, if

24  that --

25          THE COURT:  What grounded the -- what grounded the       10:46

```
 1    aircraft?

 2              MS. GROMBACHER:  Right.  I mean, what we walked

 3    through right there, if it's material --

 4              THE COURT:  The aircraft was --

 5              MS. GROMBACHER:  -- if it's material to the Court and      10:47

 6    certification, it will be difficult for us to certify.

 7              THE COURT:  I'm not sure about that.

 8              MS. GROMBACHER:  Okay.

 9              THE COURT:  Do you have anything you wish to add?

10              MR. ELLIS:  On this particular issue, Your Honor?          10:47

11              THE COURT:  On this particular issue.

12              MR. ELLIS:  No, sir.

13              THE COURT:  Give me just a moment.  I'm going to take

14    a look at your complaint.

15              By the way -- do you have a copy of your complaint        10:48

16    here?

17              MS. GROMBACHER:  I do.

18              THE COURT:  While I'm looking here, could you tell me

19    what you've alleged in terms of subject matter jurisdiction?

20              MS. GROMBACHER:  Over which defendant entity?  Either     10:48

21    defendant entity?

22              THE COURT:  I'm looking as to why this Court has

23    subject matter jurisdiction over this action.

24              MS. GROMBACHER:  Diversity, and I guess CAFA would

25    also come into it.                                                  10:48
```

1          THE COURT:  Was CAFA alleged?

2          MS. GROMBACHER:  You know what, I'm looking at the

3   diversity section, and it was not, Your Honor.  So perhaps

4   inartful pleading, but this case would be in this courtroom

5   because of diversity and because of CAFA.                    10:48

6          THE COURT:  In paragraph 22 of your complaint, you

7   alleged in your complaint that people weren't permitted to

8   board other flights or to leave the terminal.  What's the basis

9   for that?

10         MS. GROMBACHER:  That was in speaking to my plaintiff   10:51

11  and her experiences with what she personally witnessed from

12  other passengers who requested to be able to leave.

13         THE COURT:  So she told you that people weren't

14  permitted to board other flights?

15         MS. GROMBACHER:  Correct.                              10:52

16         THE COURT:  Wherein they weren't permitted to leave

17  the terminal area?

18         MS. GROMBACHER:  They could not -- yeah, she called

19  it quarantined in the terminal area.  They were not permitted

20  to leave or go to a hotel or to any rental place.            10:52

21         THE COURT:  Let me ask you something.  Do you have

22  any information that the crew, at the time the plane landed in

23  Phoenix, that they announced the reason?

24         MS. GROMBACHER:  No.  And, in fact, she was told when

25  she contacted Frontier that there wasn't an issue with the    10:52

```
 1   plane.  However, she was told also by other individuals that
 2   the crew members were taken to a hospital facility to be
 3   checked out and evaluated.
 4            THE COURT:  Well, I understand -- I understand that.
 5            MS. GROMBACHER:  Okay.                                 10:52
 6            THE COURT:  What I'm trying to get at is whether
 7   there was any information at the time the people were taken off
 8   the plane as to the reason.
 9            MS. GROMBACHER:  No, she did not understand the
10   reason.                                                        10:53
11            THE COURT:  Okay.
12            MS. GROMBACHER:  They assumed that it was the smoke
13   because that was -- or the fumes because that's what they
14   smelled, but they didn't understand exactly -- they were never
15   provided with a specific reason.                               10:53
16            THE COURT:  Okay.
17            MS. GROMBACHER:  Or at least she wasn't.  Nobody she
18   -- that was around her was.
19            THE COURT:  Did she ask whether she could leave?
20            MS. GROMBACHER:  Your Honor, she did ask if she could 10:53
21   leave, and she was told no.
22            THE COURT:  And the time that she asked she could
23   leave was what?
24            MS. GROMBACHER:  Specifically at what point during
25   her confinement, I'm not sure exactly without talking to her or 10:53
```

 1    refreshing my memory with a -- with a memo.  But she was told

 2    she could not leave, and she was forced to stay until they got

 3    her --

 4            THE COURT:  Okay.  Do you know if there were any

 5    other terminals that were open?  Any other --                    10:54

 6            MS. GROMBACHER:  My understanding is that there were

 7    not, that the airport was pretty much shut down.  But I don't

 8    want to misrepresent because I don't have that information.

 9            THE COURT:  Well, you've been in airports.

10            MS. GROMBACHER:  Yeah, I've been -- and I've landed     10:54

11    pretty late at night, and you know how it's, you know,

12    everything is shut down.

13            MR. ELLIS:  Everything is shut down.

14            MS. GROMBACHER:  Yeah.  So I'm assuming, based on my

15    conversation with her and my experience, that's what we're     10:54

16    dealing with here.  But again, I don't --

17            THE COURT:  Were they given travel vouchers?

18            MS. GROMBACHER:  They were given a $200 travel

19    voucher -- or she was given a $200 travel voucher.  I assume

20    that was consistent, but I don't know.                          10:54

21            THE COURT:  And was she placed on another flight?

22            MS. GROMBACHER:  She was placed on another flight.

23            THE COURT:  Do you know what that flight was?

24            MS. GROMBACHER:  I don't have it here.  She may have

25    that in her ticketing information, but I don't know off the top 10:54

```
 1   of my head.  But she did get to Orlando the next day.

 2           THE COURT:  And do you know what the cost was for

 3   that flight or what your client paid?

 4           MS. GROMBACHER:  For the rerouted flight?

 5           THE COURT:  No.                                      10:55

 6           MS. GROMBACHER:  Her original ticketed price?

 7           THE COURT:  Her original.

 8           MS. GROMBACHER:  I don't.  I'm sorry.  I mean, I have

 9   that information, but I just don't have it here and I didn't

10   put it in the complaint.                                     10:55

11           THE COURT:  Okay.  And do you know if there were

12   other people who asked to leave other than your client?

13           MS. GROMBACHER:  It's my understanding, from my

14   discussions with our client, that she also heard other

15   passengers request to leave.                                10:55

16           THE COURT:  You know, and the only -- well, I

17   shouldn't say "the only."  But what you're basically telling me

18   is that people detected an odor?

19           MS. GROMBACHER:  Yes, there was an odor in the

20   aircraft.                                                    10:55

21           THE COURT:  And I think you alleged in the complaint

22   that people were -- had different reactions to that odor?

23           MS. GROMBACHER:  Yes, they can, as is common with --

24           THE COURT:  I'm sorry?

25           MS. GROMBACHER:  Yes, they did and they can, as is    10:56
```

```
 1    common with, you know, exposure to --

 2              THE COURT:  Right.

 3              MS. GROMBACHER:  Depends on the person's sensitivity,

 4    their exposure levels, where they were, where it was, that kind

 5    of thing.                                                   10:56

 6              THE COURT:  And some people were examined by

 7    paramedics?

 8              MS. GROMBACHER:  Yes.

 9              THE COURT:  Some people were taken to hospitals?

10              MS. GROMBACHER:  I believe the crew members may have 10:56

11    been taken to a hospital.

12              THE COURT:  Were there any other passengers --

13              MS. GROMBACHER:  I don't know about the passengers.

14              THE COURT:  Okay.  And your client wasn't taken?

15              MS. GROMBACHER:  My client was not taken.         10:56

16              THE COURT:  And she hasn't suffered any other

17    personal injuries as a result?

18              MS. GROMBACHER:  It doesn't appear that she has any

19    long-term exposure issues.

20              THE COURT:  And what does she do for a living?     10:57

21              MS. GROMBACHER:  She is a hairdresser.

22              THE COURT:  The travel voucher that she was given --

23              MS. GROMBACHER:  Mm-hmm.

24              THE COURT:  -- was that for Frontier?

25              MS. GROMBACHER:  Yes.                             10:57
```

```
 1              THE COURT:  And was she required to book her own

 2   ultimately that flight to --

 3              MS. GROMBACHER:  The rerouted?

 4              THE COURT:  Yes.

 5              MS. GROMBACHER:  I believe they assisted with that.      10:57

 6              THE COURT:  I'm sorry?

 7              MS. GROMBACHER:  I believe that Frontier assisted her

 8   in completing the travel for that -- for that trip that was

 9   disturbed.

10              THE COURT:  Did Frontier pay for that?                  10:57

11              MS. GROMBACHER:  I believe so, yes.

12              THE COURT:  Doesn't the case law say that the issue

13   of warnings are field preempted because they're dictated by the

14   FAA?

15              MS. GROMBACHER:  That claim may be a little bit more    10:58

16   problematic.

17              THE COURT:  It may be.

18              MS. GROMBACHER:  We've seen case law -- we've seen

19   case law that's good, in terms of the design of the aircraft,

20   and then there still being --                                     10:58

21              THE COURT:  Yeah.  But I thought you said earlier

22   that this was --

23              MS. GROMBACHER:  There's a design issue, strict

24   liability.

25              THE COURT:  And there's a failure to --                10:58
```

1          MS. GROMBACHER:  There is a failure to warn claim.

2    And that is one of the issues is the defendants do want to

3    raise a preemption defense --

4          THE COURT:  Yeah, I --

5          MS. GROMBACHER:  -- as to some or all of the claims,     10:58

6    yes.

7          THE COURT:  I understand that's what they want to do.

8          MS. GROMBACHER:  And so one thing that we did propose

9    to the Court is that we hear some of those issues that might

10   narrow the scope.                                             10:58

11         THE COURT:  I know what you've proposed.  And, you

12   know, if I did what you guys are talking about doing, my chief

13   would be on me because she's a firm believer in, I guess, Chief

14   Justice Roberts' edict that we move these cases along.

15         And so, you know, I think -- I think you're going to     10:59

16   have a real uphill climb as to that certification as to this

17   larger class.  And if you're going to be able to certify a

18   class, it's probably going to be as to that subclass.  So my

19   feeling is, is that we probably should start with seeing if

20   indeed you can get that subclass certified.                   10:59

21         MS. GROMBACHER:  If that's what the Court wants to

22   do, we will -- you know, we'll do it.

23         THE COURT:  Okay.

24         MS. GROMBACHER:  But we would request some movement

25   from the current certification deadline so we can conduct some     10:59

```
 1   modicum of discovery to support it.

 2           THE COURT:  If you're -- if there is a modicum of

 3   discovery that you need, that's fine.  But I -- you haven't

 4   told me yet what you need that can't be done between now and

 5   the existing date, which is October 22nd --

 6           MS. GROMBACHER:  Right.

 7           THE COURT:  -- as to certification.

 8           MS. GROMBACHER:  Well, we need information on, you

 9   know, how -- some of which it sounds like is in process, being

10   requested from the client, but information -- I still think we

11   need --

12           THE COURT:  By the way, have you propounded any

13   discovery?

14           MS. GROMBACHER:  No, Your Honor, because we have been

15   meeting and conferring on how this case is going to get

16   litigated.  And we wanted to tailor the discovery, truly, to be

17   efficient so that we could either go towards the course of

18   looking at these underlying substantive legal issues or

19   certification.  Not formal bifurcation of discovery because

20   there is entanglements, but we did want to tailor the discovery

21   so that we were working on discovery that was going to be

22   relevant to what we were putting before the Court.

23           THE COURT:  So tell me, what discovery, for example,

24   is needed on a failure to warn?

25           MS. GROMBACHER:  Well, I'd like to know how
```

11:00

11:00

11:00

11:00

11:01

```
 1   frequently these events occurred for the defendants.  I mean,

 2   we need to know that they know these are occurring, you know,

 3   can we even establish their knowledge of duty on their part.

 4   We need the information about the plane, how it's constructed,

 5   that it's consistent amongst the aircraft.                      11:01

 6           THE COURT:  Well, I think they're at least as to --

 7           MS. GROMBACHER:  You're talking only about the

 8   subclass.  The only --

 9           THE COURT:  Excuse me.

10           MS. GROMBACHER:  -- issue I see with the subclass, if  11:01

11   we certify it in stages, is --

12           THE COURT:  You know, I'll try and not interrupt you

13   if you try and not interrupt me.

14           MS. GROMBACHER:  I didn't mean to do it.  I'm sorry.

15           THE COURT:  That's okay.                                11:01

16           So if this is a failure to warn for the class and the

17   case law says that warnings are field preempted because they

18   are dictated by the FAA rather than claim preemption, which may

19   apply to, as you say, the design certifications --

20           MS. GROMBACHER:  Yes.                                   11:02

21           THE COURT:  -- I'm not sure there is discovery that

22   is needed or necessary as to the failure to warn claim.  So

23   what I would ask is that you people meet and confer, like

24   you've been, and see if we can at least agree as to that issue.

25   Because I think the case law is pretty clear that at least as   11:02
```

1    to a failure to warn, that's probably field preempted because

2    it's dictated by the FBI (sic).  So if we can sort of narrow

3    the scope of the issues in this case, I think that would be

4    helpful.

5          So it seems to me that because the plaintiff's                   11:02

6    complaint alleges that some passengers were analyzed by

7    paramedics, some were taken to the hospital, and that

8    passengers had different reactions to this event, that those

9    allegations indicate that the individual passengers had

10   different exposures and reactions to this alleged event.             11:03

11         And as a result, it seems to me, that individualized

12   determinations appear to be necessary on the liability, and

13   that class treatment as to those issues is unlikely as to the

14   predominance and superiority requirements that are required by

15   Rule 23 for that Flight 1630 class.  And those kinds of            11:03

16   concerns are even greater with respect to the more complex

17   nationwide class that's alleged in the complaint.

18         And I'm not sure that there is any real reason to

19   delay the motion for class certification as to the Flight 1630

20   class.  And, therefore, I'm going to deny the continuance of      11:04

21   the Rule 23-3 deadline.  And that present deadline is

22   October 22nd.

23         And any oppositions and replies to any motion that's

24   filed as to that issue are dictated by the local rules of this

25   court.  And to the extent we need to -- if that class             11:04

```
 1   certification issue is still alive and well with respect to

 2   Airbus once they're served, the Court is more than happy to

 3   revisit that issue once Airbus has been properly joined.

 4          And if there are issues that are raised as a defense

 5   to the motion for class certification or the plaintiff            11:05

 6   determines that there are discovery that's needed as to the

 7   class certification as to the subclass, I'll be happy to

 8   entertain that and see if it's appropriate.

 9          MS. GROMBACHER:  So just by way of clarification,

10   Your Honor, as to the subclass, you would require that all of     11:05

11   the claims alleged we would -- we would need to be seeking

12   certification on by October 22nd?  That includes the strict

13   liability claim, that includes --

14          THE COURT:  As I understand it -- well, the answer to

15   your question is yes.  As I understand it, I thought that we       11:05

16   had sort of narrowed the focus, that you were seeking really

17   class treatment as to your false imprisonment claim.

18          MS. GROMBACHER:  Well, we still -- we still would be

19   seeking --

20          THE COURT:  Then I guess --                                 11:06

21          MS. GROMBACHER:  -- the economic issue, the damages

22   that would stem from strict liability claims on behalf of even

23   that subclass as well.

24          THE COURT:  Okay.  Well, as to the subclass, yes,

25   you're -- because it seemed to me the only reason that you         11:06
```

1   alleged was the failure of Airbus to be in this case in your

2   motion.  So yes, as to class certification for the subclass on

3   any issue, it's October 22nd.

4          MS. GROMBACHER:  Okay.  And to the extent that we may

5   require some discovery from Airbus, in terms of the design of     11:06

6   the subject aircraft, I would come in ex parte to you in

7   advance of 10/22 --

8          THE COURT:  I mean, you can --

9          MS. GROMBACHER:  -- or just put it in the papers?

10         THE COURT:  You can put it in the papers.  But if       11:06

11  you're dealing -- you've alleged, I believe, a subclass that

12  has nothing to do -- that pretty much has to do with Frontier.

13  Let me just ask a couple questions.  Was Frontier conducting

14  their own maintenance on this aircraft?

15         MR. ELLIS:  I believe so, yes, Your Honor.              11:07

16         THE COURT:  Okay.  And so I take it then that, as far

17  as you know, Airbus's involvement with the aircraft stopped

18  after it was sold to whoever bought it, at least initially?

19         MR. ELLIS:  Well, more or less, Your Honor, but I'm

20  sure you -- I sense you are aware, obviously --                11:07

21         THE COURT:  You'd be sensing correct.

22         MR. ELLIS:  -- the maintenance of the aircraft has to

23  be done in accordance with the FAA-approved and certified

24  maintenance manual that we would be getting from Airbus after

25  the FAA approves it.                                           11:08

1          So to the extent we're following their directives

2    when we're doing maintenance, yes, they're, you know, I guess

3    indirectly involved.  But, more or less, the maintenance was

4    being done by Frontier.  That's my understanding.

5          THE COURT:  Okay.                                        11:08

6          MR. ELLIS:  And, of course, Your Honor, we're

7    operating, as we're required by law to operate, only aircraft

8    that are certified by the FAA and found airworthy, including

9    airworthiness --

10         THE COURT:  So your position is that the issuance of    11:08

11   that type certificate grants you some sort of immunity?

12         MR. ELLIS:  It's a preemption-based defense, Your

13   Honor.

14         THE COURT:  Well, I don't know that that's going to

15   get you very far in this court, in this courtroom.           11:08

16         MR. ELLIS:  Okay.  But we're --

17         THE COURT:  It's going to help you, I think, with

18   respect to the failure to warn.  But you need to find me some

19   cases that talk about field preemption with respect to design

20   defects.                                                      11:09

21         MR. ELLIS:  The only thing though, Your Honor, we're

22   not the manufacturer, of course.

23         THE COURT:  I understand that.

24         MR. ELLIS:  I sense you do.

25         THE COURT:  Okay.                                       11:09

```
 1              MS. GROMBACHER:  Okay.

 2              THE COURT:  All right.

 3              MR. ELLIS:  Thank you, Your Honor.

 4              THE COURT:  Thank you very much.  By the way, are you

 5    aware of -- or as Columbo used to say, just one other thing.    11:09

 6              MS. GROMBACHER:  Okay.

 7              THE COURT:  Are you aware of any personal injury

 8    design defect cases involving an aircraft that have been

 9    treated as a class in the last ten years?

10              MS. GROMBACHER:  Well, there are some cases, I         11:09

11    believe, out of the Third Circuit.  We looked into this.  The

12    design defect issue has been able to escape preemption.  And I

13    believe some of those cases --

14              THE COURT:  I'm not talking about preemption.

15              MS. GROMBACHER:  You mean class actions?              11:10

16              THE COURT:  Mm-hmm.  And there certainly hasn't been

17    any in the Ninth Circuit.

18              MS. GROMBACHER:  Perhaps this will be the first.

19              THE COURT:  And the Ninth Circuit has spoken

20    pretty clear --                                                11:10

21              MS. GROMBACHER:  But, again, this is --

22              THE COURT:  You're familiar with the *McDonnell*

23    *Douglas* case?

24              MS. GROMBACHER:  I do understand the issue with

25    personal injury -- certification of personal injury.          11:10
```

1          THE COURT:  It's like being -- it's like you being on

2     the one-yard -- on your own one-yard line.

3          MS. GROMBACHER:  I do understand.

4          THE COURT:  And it's 4th and 40.  But we'll see.

5          All right.  Thank you very much.                           11:10

6          MS. GROMBACHER:  Thank you.

7          MR. ELLIS:  Thank you, Your Honor.

8          THE COURT:  I'm going to give you some dates.

9          MS. GROMBACHER:  Yeah, that is probably a good idea.

10         THE COURT:  And, of course, these dates apply to the      11:11

11    parties that I now have before me.  To the extent Airbus comes

12    in here, we may have to do something else.  But at least as to

13    these parties that are before me right now -- well, let me ask

14    this before I give these dates out:  What mediation method do

15    you want to utilize?  Private mediation?                        11:12

16         MS. GROMBACHER:  I think we selected private

17    mediation; right?

18         MR. ELLIS:  Sure.

19         THE COURT:  Okay.  We're going to set the case for

20    trial on August 20th of 2019.  Your final pretrial exhibit      11:12

21    stipulation is due August 15th of 2019.  I'll hear any motions

22    in limine on August the 12th at 1:30 along with any disputes

23    you have about jury instructions.

24         The final pretrial conference will be July 19th of

25    2019.  Your motions in limine should be filed at that time      11:12

1   along with any proposed questions you want me to ask the jury

2   as well as an agreed to statement of the case.  You should

3   lodge your proposed pretrial conference order on July 5th along

4   with your initial pretrial exhibit stipulation.

5           You should file your contentions of law and fact by     11:13

6   that date, and again, that's July 5th, along with your exhibit

7   and witness lists, a joint status report regarding settlement,

8   an agreed upon set of jury instructions and verdict forms, and

9   a joint statement regarding any disputed jury instructions and

10  verdict form.                                                    11:13

11          The last day to conduct a settlement conference in

12  this case is June 24th of 2019.  The last day to hear motions,

13  not file, is June 17th of 2019.  The discovery cutoff date is

14  June 10th of 2019.  The last day to hear a motion to amend the

15  pleadings or add additional parties is December 27th of 2018.    11:14

16          By the way, does the Airbus -- it was a 320?

17          MS. GROMBACHER:  I believe it was a 320, but it might

18  be a 319.

19          THE COURT:  You think it's a 319?  Is it equipped

20  with an APU?                                                     11:14

21          MR. ELLIS:  Yes, I'm almost certain it is, Your

22  Honor.

23          THE COURT:  Okay.  And as far as I know, the only jet

24  aircraft that doesn't use bleed air is the Boeing -- the new

25  Boeing 787.                                                      11:14

1          MR. ELLIS:  That's my understanding as well, Your

2     Honor.

3          THE COURT:  Okay.  And bleed air has been used for

4     decades.

5          MR. ELLIS:  Absolutely right, Your Honor.  And there        11:14

6     have been studies conducted both by IASA as well as the FAA.

7          THE COURT:  Oh, and there are no current -- well, was

8     there an NTSB investigation conducted?

9          MR. ELLIS:  Not to the best of my recollection, no,

10    there wasn't, Your Honor.                                         11:15

11         THE COURT:  Okay.  And there are no -- there is no

12    pending FAA investigation?

13         MR. ELLIS:  My understanding is there is not.

14         MS. GROMBACHER:  I don't believe so either, Your

15    Honor.                                                            11:15

16         THE COURT:  And there's no service advisories issued

17    by the FAA concerning bleed air?

18         MS. GROMBACHER:  No, I don't believe so.

19         MR. ELLIS:  My understanding is the exact same, Your

20    Honor.                                                            11:15

21         THE COURT:  Okay.  Thank you.

22                   (Proceedings concluded.)

23                          -o0o-

24

25

1                    C E R T I F I C A T E

2

3              DOCKET NO. LACV 18-4916-PA

4

5          I hereby certify that pursuant to Section 753,
   Title 28, United States Code, the foregoing is a true and
   accurate transcript of the stenographically reported
6  proceedings held in the above-entitled matter and that the
   transcript page format is in conformance with the regulations
7  of the Judicial Conference of the United States.

8

9

10

11   /S/ Phyllis A. Preston      DATED:  November 21, 2018

12  Federal Official Court Reporter

13  CSR, FCRR

14

15

16

17

18

19

20

21

22

23

24

25